**Emma R. MONKS, Appellant,**

**v.**

**UNIVERSAL UNDERWRITERS INSUR-ANCE COMPANY, Appellee.**

**No. 328.**

Court of Civil Appeals of Texas.

Tyler.

Feb. 29, 1968.

Rehearing Denied March 21, 1968.

Tyner & Bain, Jerry Bain, Tyler, for appellant.

Ramey, Brelsford, Flock, Devereux & Hutchins, William V. Jeffus and Michael A. Hatchell, Tyler, for appellee.

SELLERS, Justice.

This is a workmen's compensation case brought by appellant, Emma R. Monks, against appellee to recover death benefits under the statutes for the death of James M. Monks. The following statement of the case is taken from appellant's brief:

"At about noon on October 7, 1965, Decedent, James M. Monks, was engaged in the task of criss-crossing tires on an automobile inside the shop at Harvey Pontiac Company. He was working on the left rear tire of an automobile when he stood up and made an exclamation spontaneously and voluntarily to the effect that he did not feel good or that he hurt very badly. Such exclamation was overheard and testified about by a fellow employee working nearby. Mr. Monks left the shop for approximately 5 minutes, returned and again made an exclamation with regard to his physical condition; the shop foreman was called and Mr. Monks was taken home. He saw Dr. Sterling E. Moore, M. D., that same day. A heart attack was diagnosed and the patient was admitted to Mother Frances Hospital on October 7, 1965, where he remained until November 17, 1965. Thereafter, he was treated by Dr. Moore until the date of his death on April 12, 1966; an autopsy was performed and the cause of death determined to be hemorrhage of the brain. Dr. Moore testified such hemorrhage was caused by blood-thinning medications prescribed to try to prevent further blood clots to the coronary vessels. Defendant introduced a certified copy of the death certificate and rested.

"Plaintiff gave notice of appeal and brings this case before this Honorable Court for review."

The appellant in her brief asserts that the appellee in its motion for instructed verdict, which was granted, set out two grounds upon which appellant had failed to make a case to go to the jury. The first ground is as follows:

"(a) 'There is absolutely no evidence of any probative force that Decedent, James Monks, sustained an accidental injury within the scope and course of his employment with Harvey Pontiac Company; * * *.' "

■■■ We are of the opinion that this point must be sustained by this Court. There can be no doubt that a heart attack brought on an employee in the course of his employment from strain or overexertion is an accidental injury to the physical structure of the body and is covered by the Workmen's Compensation statute. 62 T.J. 2d, Section 105, page 678. We are thoroughly in accord with the rule in passing upon the evidence where the court instructs a verdict against the appellant that all of the evidence must be viewed in a light most favorable to the appellant. City of Houston et al. v. Chapman, 132 Tex. 443, 123 S.W.2d 652.

From this record, there can be no doubt that deceased suffered a heart attack while in the course of his employment for his employer from which he died. The attack struck him on October 7, 1965, and he died on April 12, 1966.

The witness Robinson testified that he was working about 15 feet from the deceased:

"Q Where was Mr. Monk in relation to you?

"A He would be on the other side—he would be right in view to my right a little bit.

"Q How far away did you say he was?

"A Fifteen or twenty feet; about a car length and a half or so.

"Q At about noon on that day, can you tell me what Mr. Monks was doing?

"A He was criss-crossing some tires.

"Q All right. Working there at Harvey Pontiac?

"A Yes.

"Q Here in Smith County, Texas?

"A Yes.

"Q And you were working right next to him or close to him?

"A That's right.

"Q You were tuning up a car and he was criss-crossing some tires?

"A That is correct.

"Q All right. Can you tell me what he was doing in particular, what his particular duties were or what doing at the particular time?

"A He was going to criss-cross the tires and balance them out. I know that, and he was, of course, front end mechanic and everything.

"Q All right. Had he jacked the car up?

"A Yes, he had.

"Q Had he taken all the lugs off or do you know?

"A Well, yes, all of the wheels were loose.

"Q How did you know that?

"A Well, I could tell by the sound of the air wrench he was using and he was not too far from me and I could watch him as he was working around the tires.

"Q As you were leaning over your car for the tune up work, he was in your view; is that right?

"A Right.

"Q And you were sort of looking that way?

"A That is true.

"Q Now, then, what first called your attention to Mr. Monks?

"A Well, I don't think any one thing in particular. He stood up as I was—

"Q Where was he when he stood up?

"A He was at the left rear of the car that he was crossing tires on. He stood up and said 'I don't feel good'.

"* * *
"Q Mr. Robinson, at the time he stood up, did you ask him any questions?

"A No, I did not.

"Q Did he volunteer a statement?

"A Yes, he said that—

"Q What did he say?

"A He said 'I hurt pretty bad', or 'I hurt real bad' and I don't remember the exact words or anything or 'I don't feel too good' and I don't know whether it come in that order. He might have said 'I don't feel too good' or 'hurt pretty bad' or something like that.

"Q What happened next?

"A He said 'I am going out and lay down in the car and you tell them where

**434**

I am in case they miss me or in case they need me'.

"Q Did he leave the building?

"A Yes, sir, he did.

"Q When, if ever, did he come back?

"A In about five or six minutes. Just a real short period.

"Q What happened then?

"A He come back and says 'Well, I believe I am going to make it now' and then he turned around and said—he opened the car door on the car that was not being worked on and was just settin' there. He said 'No, I am going to lay down in this seat' and says 'You know where I can get glycerine pills' and I said 'I don't know unless at a drug store' and he said "Well, it doesn't matter. I don't have a prescription'. Then he says 'Well, maybe you better go get Al to take me home'; so I left him there and went to the service desk and got Al Richardson and he carried him home.

"Q You didn't go home with him?

"A No, sir.

"Q You went ahead and continued the work you were doing?

"A That is correct.

"Q Who finished Mr. Monks' job?

"A I did.

"Q At the time you began work on his job, did or had anybody else touched the car?

"A To my knowledge, no.

"Q When you went back to that car and went back to the left rear wheel, tell the jury what you found.

"A Well, all of the lug nuts were off and the wheels were loose; the left rear wheel, which was the one he was working on whenever I first noticed him, and when he first told me about that, the top of it was still up under the fender of the car and the wheel part was just sorta laying on the hub under the brake of the car at an angle.

"Q And you took the wheel out and finished the job?

"A Yes, sir, that is correct.

"Q Now, then, Mr. Robinson, when he stood up and made the explanation to you about the pain and the fact he hurt, did you stay where you were and did he stay where he was or did either of you change positions?

"A Er— I think we walked up fairly close or I did. I walked over closer. I don't believe that he moved over a foot or two in either direction. He might possibly have but not far. * * *"

The following testimony of Dr. Moore was admitted over the objection of Appellee:

"Q Now, did he relate to you how he claimed to have sustained this heart attack? What he was doing at the time or anything of that nature?

"A Of the one in 1960 or the last one?

"Q The last one.

"A When he had the pain back in October of 1965, he said he was doing some heavy work as a mechanic but the exact duties I am not certain of. * * *"

It will be noticed that the witness Robinson did not describe the work that the deceased was doing at the time he became ill. He was not asked if the work was strenuous or required the lifting of heavy tires. The evidence does not divulge the kind of car that Mr. Monks was working on. We note that he took the lugs off the wheels with a machine. This apparently was all that had been done at the time Mr. Monks was stricken. Whether there was any strain or overexertion at the time of the attack, no one has said, notwithstanding that another mechanic was working within 15 feet of Mr. Monks.

The appellant relies heavily on the testimony of Dr. Moore taken from Mr. Monks sometime after the attack in which counsel, over the objection of appellee, secured this information:

"Q Now, did he relate to you how he claimed to have sustained this heart attack? What he was doing at the time or anything of that nature?

"A Of the one in 1960 or the last one?

"Q The last one.

"A When he had the pain back in October of 1965, he said he was doing some heavy work as a mechanic but the exact duties I am not certain of. * * "

 This statement was not admissible to prove the fact of injury or how it occurred. Texas Employers' Ins. Ass'n. v. Morgan et al., Tex.Civ.App., 187 S.W.2d 603. The rule is stated as follows in that case:

" * * * A history of the case given by an injured person to a physician for the purpose of enabling such physician to properly diagnose his case is ordinarily admissible. However, there are certain exceptions to this rule, one exception being when such statements relate to the disputed issue of how the injury occurred. * * * "

Not a single hypothetical question was asked of the doctor, and we are at a loss to know whether the doctor did say that the strain or overexertion brought about by the criss-crossing of the tires on a car would be calculated to produce the heart attack that he found Mr. Monks suffering from on October 7, 1965.

Finding no probative evidence that the work being performed by the deceased at the time of the heart attack was strenuous or required overexertion, the judgment of the trial court is affirmed.

Affirmed.